Aerial Stations Administration, et al. Mr. Lawspeaker for the Petitioner and the Assembly Thank you. I'm going to respond. Good morning, Your Honors. May it please the Court, in the FAST Act of 2015, Congress directed the Department of Transportation to establish security and confidentiality protections to prevent the release to unauthorized persons of the information that railroads must disclose to state and local authorities under the Act. That specifically includes the advanced notification information at issue here, which is regularly updated county-by-county data on the routes, number, contents, and emergency response plans for each railroad's trains carrying certain hazardous materials. But the agency failed to establish any security or confidentiality protections for this information because it had already concluded, before Congress passed this statute, that this information was not proprietary or security-sensitive under pre-existing federal regulations. That position is unlawful for three basic reasons. First, Congress expressly directed DOT to establish security and confidentiality protections not only for proprietary and security-sensitive information, and not only for the real-time information that the government emphasizes in its brief, but for any information railroads disclose under this statute, expressly including the advanced notification information at issue here. Second. Wait, so is your position that Congress meant to prevent the release to the public, period? Is that right? Of both categories of information. No, but no, you just said it doesn't matter whether it's security and confidentiality. Yes, that's correct, Your Honor. So then why begin, if that's true, and that is how I understood your argument, your argument is that any information that's provided to the railroads at the end of a very long sentence here with three oars has to be prevented. Then why is Congress wasting so many words? Why say establish security and confidentiality protections when they really mean no one can get it except for the fusion center and the resource center or whatever? I think establish security and confidentiality protections is a fairly natural way for Congress to say. Not if what they really mean is don't release it at all, even if it has nothing to do with security or confidentiality. That is your position, right? Your argument is that it's confidentiality is automatically involved because this information for the mandated disclosure had not been disclosed. Is that right? Yes, Your Honor, that's correct. This information was first required to be disclosed in DOT's emergency order in 2014. And after that, there was a period of about a year and a half where the agency essentially flip-flopped on whether this information should be protected from public disclosure more broadly than the listed recipients in the emergency order. And it essentially took the position, although not without some inconsistency, that this information could not be protected from broader public disclosure because it was not proprietary or security sensitive under DOT's and TSA's regulations governing that information. I think I understand that argument. But what I'm somewhat puzzled by is that I see two things. You appear to be contending that there are serious proprietary interests in the information in dispute here. Yes, Your Honor. But you also, at no point so far as I can see, have offered evidence or a hypothetical suggesting how any particular snippet of this information might create a problem. Well, the key aspect of the information that is required to be disclosed under the FAST Act is that it includes the routes that the trains take by county for each railroad. And the government emphasizes that this information does not include, for example, origins, destinations, or customers. But if you have county-by-county information about each railroad's routes by which its trains carry hazardous materials, it's not actually that difficult to figure out a lot of that information, which the government seems to agree is sensitive. And this is actually a point that the Association of American Railroads made in its comments on the rulemaking. I'm sorry, where are those comments? Those comments are in the JA at 109, Your Honor. And I believe actually – I'm sorry, the agency also noted this point in the – I believe it's in the NPRM at JA 119. But our point, Your Honor, is that whether or not this information qualifies as proprietary or security sensitive under the preexisting regulatory regime, Congress in the FAST Act essentially said to the agency, that doesn't matter. What you need to do with both categories of information listed in the confidentiality provision here is prevent the release of this information to unauthorized persons. But then why don't – I'm still stuck with why don't they say that. So normally we presume that Congress knows what the words mean, particularly in this kind of context. Certainly. And security and confidentiality protections have defined meanings in the regulations, right? And that's not recent. That's since TSA began, since 9-11. So they've had these in 49 CFR, and they have concluded, both Homeland Security and DOT, that this information doesn't qualify under those definitions. So if Congress wanted to do more, then I don't see why they would continue to use the same words, exactly the same words as are used in the regulations. Why don't they just say what you said, which is public doesn't get this information, period. So two points there, Your Honor. First, as I understand the government's own construction of this language, and certainly this is how we read it, the reference to the preexisting security and confidentiality provisions that you refer to, the DOT and TSA regulations in 49 CFR, is in the including clause. That's including protections from the public release of proprietary information or security-sensitive information. And if that were the only thing the government had to do, then this would be a very different case. But that information is a subset of the information that this provision expressly tells the agency to protect. The agency must establish protections, including protections for proprietary information or security-sensitive information, to prevent the release to unauthorized persons of any electronic train consist information, that's the real-time info that's not at issue here, or advanced notification or information provided by the railroads. And that's the information that is at issue here. But what does, okay, what does or mean? So if your position is to prevent the release to unauthorized persons of any electronic train consist information and any advanced notification and any information provided by Class I railroads, that's what you think it means, right? I think that's the only way to read this language. Your Honor, if you take the or here to give the agency the option, then I think Congress would basically be saying you can sort of pick among the categories to protect. Right, right. And that exactly is the agency's point. Certainly it is, Your Honor. But if you read the or purely disjunctively, then it implies the agency has to pick fewer than all, and I don't think that's the implication of the language here. Well, but that's the ambiguity that is created by it. This is no model of draftsmanship, as I'm sure you would agree. Absolutely not. And every time I read it, I see something different. But the words, the continuing use of or, it has an inclusive meaning and it has an exclusive meaning and it has a disjunctive meaning and it has an and or meaning. There's a lot of meanings of or here, and I take it the government's reading is that some of these things get one kind of protection, some of these are worthy of confidentiality and security, and some of them aren't. I agree that that is the government's reading. I don't think the government has invoked the sort of or language that you're referring to. As I understand the government's position in the final rule, it is essentially that the term unauthorized persons, as used in this provision, and I think we agree with the government that that is really the crux of this language. The government says that refers, at least in connection with the advance notification information here, to state open records laws, that that's essentially Congress incorporating into this provision all 50 states open records laws so that there are only unauthorized persons insofar as any individual state would deny a FOIA request under state law for this information. With respect to the information that's not security sensitive or confidential. With respect to the advance notification. It's not all information. It's to a third group of kind of information.  And that simply is not a plausible reading of the term unauthorized person as used here. For one thing, it would have been very easy for Congress to refer explicitly to state law if it intended the contours of this federal confidentiality protection to vary based on state law. And, in fact, there is a strong presumption under Jerome v. United States or Mississippi Band of Choctaw Indians v. Holyfield, as we cited in our reply brief, that Congress does not intend the protections of federal law to vary based on inconsistent state law precisely because federal law is presumptively uniform across the entire country. But you're not giving it any definition either. You're giving it a zero definition. You're just saying all information can't be disclosed. Our definition of unauthorized persons, Your Honor. No, but of confidentiality and security. Your information is that everything, your view is that everything is protected, right? Our view is certainly that both categories of information named in the statute are protected and, therefore, the agency must establish protections sufficient to, as the statute says, prevent the release to unauthorized persons of that information. And are you saying the same level of protection is required across these categories? Not necessarily, Your Honor. I think the agency probably does have some amount of leeway under this language to vary the level of protection. But what it can't do is enact no protections whatsoever because it concludes that some of this information is not sensitive even though Congress explicitly named it in this provision. And the government's take, and I think the view that you articulated earlier, Your Honor, based on Orr, that it can choose which of these categories to protect or not to protect might make more sense if this were a laundry list of different information. But the confidentiality provision only names two different types of information, both of which are addressed in the adjacent provisions of the FAST Act. And in that situation, it makes much more sense to conclude that Congress said, here are the two categories of information that you railroads must disclose, you DOT must establish protections to prevent the release of that information to anyone other than the authorized recipients. So, Your Honor, our definition of unauthorized persons in the confidentiality provision is anyone other than the recipients for this information who are specifically described in the adjacent provisions of this statute. So if you look at paragraphs A3 and A4, Congress spelled out who should get this information. Does it say anywhere that those are the people who are authorized persons? It does not use the word authorized. If they had said that, that would be very helpful. That would absolutely be helpful, Your Honor. It does not say authorized, but that is the obvious implication here because this is Congress telling railroads you must disclose this information to these people. So, of course, the recipients listed there necessarily are authorized. And reading unauthorized persons in the confidentiality provision to refer to anyone other than those people is far more natural than the government's reading of that term as implicitly incorporating every state's open records laws. I'm interested in why you have emphasized the verb establish. You have in your brief, but as I read this regulation, they've established absolutely nothing. That is exactly our position, Your Honor. Whether you're looking at the phrase established security and confidentiality protections or whether you're looking at prevent the release of unauthorized persons, none of what the agency did is sufficient to discharge its obligations under this language. I mean, the thing the only thing I see under 174.312C3, and that establishes nothing. It tells the railroads if you have something you want to keep secret, indicate it in your notification. Yes, Your Honor. And that's a very important point because the railroads already could and did do precisely that under state law. The debate that DOT engaged in over the year and a half leading up to the passage of the FAST Act was should we extend protections beyond what the railroads are entitled to under state law? If you read the FAST Act merely as incorporating the existing level of protections under state law for this information, this provision has no real function. It establishes something that didn't exist before, which is a requirement of disclosure. And the rest of the FAST Act certainly does. No, no, no, no. I mean, the regulation has the railroads list what they regard as confidential and secret. Yes, Your Honor. And then has the imprimatur of the government telling the States that the railroads think this information is covered by the state law, right? Yes, Your Honor. But practically speaking, that is exactly the situation that existed before the FAST Act. And there were no complaints that I'm aware of that states were inadvertently disclosing this information under state law, as the agency discusses in the final rule. The problem, rather, was that states were faithfully applying their open records laws to disclose this information in response to open records requests. So, again, if you read this language the way the agency reads it, it has no practical effect as to this information because it ends up just preserving the status quo exactly that existed before Congress passed the statute. And that is a particularly implausible reading of this language because we know that Congress was aware of the back and forth in the agency leading up to this point. Congress explicitly codified the emergency order here. I see my time's up. I'll just finish this point quickly. The agency has consistently acknowledged that the emergency order codified here was not intended for this information to be released publicly. In the final rule at JA119, the intent of these requirements is to ensure that local emergency responders and emergency response planning officials have access to sufficient information. Or in the Paperwork Reduction Act notice at JA119, DOT's intent in issuing the emergency order was not to cause the widespread public disclosure. Your view is that this has to – that Congress was telling the agency by regulation to preempt 50 State laws?  Well, not necessarily preempt, Your Honor. Well, you just told me the problem was that the State laws under their records laws could release the information. But a lot of State open records laws have explicit exceptions for information that is protected under Federal law. So it wouldn't necessarily take preemption to establish protection here. Any sort of Federal provision that said this information is confidential would likely be sufficient to trigger protection under State law. The problem was the absence even of that. So what about the States that – are you saying every State's open records law has an exception for Federal law? I would not swear to every one. I believe the vast majority is not open. So you think the rest are preempted? Yes, Your Honor. Normally we say we don't assume Congress means in a Federalist system to preempt State laws if they don't say so. Certainly they don't – we normally don't think that they give the agency the authority to preempt State laws. Certainly that is a general background principle, Your Honor. But here I think it is the only sensible reading of this provision, which does, after all, deal specifically with the providing of information through this Federal program to certain State agencies and actors. In that situation, it is far from a stretch to conclude that Congress told the agency to establish protections that would affect the dissemination of this information under State law, which was, after all, the essential issue that was debated extensively within DOT and among industry and stakeholders leading up to the passage of the statute. Further questions?  Thank you. Thank you. May it please the Court. Sushma Soni for the Federal Respondents. Section A mandates that the railroads have to disclose different kinds of information. And some of that information is obviously sensitive. And for that information, namely the train consist information, that is in rulemaking proceedings now. There are no rules on it. But when there are rules, the agency is going to have protections that are sufficient to meet the requirements of the statute because that information, one can see, is very important to first responders. It's very relevant to know what is in each individual tank car. But at the same time, that is the kind of information that others would want to get hold of, and they are not authorized to have it under Federal law. So for that type of information, there are unauthorized people under Federal law, unauthorized persons. But it also requires, A, requires the provision, the disclosure of other information, which is not as sensitive. And that information is not necessarily covered under, it is not restricted by other Federal law, but it might be under State law. And then there is going to be other information which is not, for which there are no unauthorized persons under Federal law or State law. For that type of information, there will be no unauthorized persons. Congress was not saying there must be someone who doesn't get this information. Congress was saying that to the extent that there are persons who are not authorized to get the information in A, we recognize that that information varies. And to the extent that there are persons who are not authorized to get it, don't let them get it. Put in place protections so that those restrictions, for instance, restrictions in Federal law, are enforced. And this is in the context of a statutory provision, A in general, which is all about requiring more disclosures to the State, so that the State can convey that information to first responders and local political subdivisions for emergency planning purposes. So that's the point of this provision. So just to go back to something, you aren't suggesting that the OR, this is in subsection 6, the first OR or the second OR, is putting those, the categories following the ORs, sort of off the table or completely at the uncontrolled discretion of the agency? We are not making that argument, Your Honor. But I'm not sure what argument you are making about them. Because this is, it's where, this is obviously lower level than the electronic train consistent information. But where does it? Well, really, Your Honor, information provided. What duty does the agency have at all with respect to that information? I'm sorry, Your Honor. What duty does the agency have with respect to the information after the first OR? The advance notification? Yeah. Or, I mean, really, information provided by Class I railroads doesn't encompass all the rest of it. Right? So that's provided by Class I railroads. So if you're asking what the agency's responsibility toward the advance notification is, well, the agency made a determination, which is not challenged here, that this advance notification, its disclosure, and we see this over the course of six years of experience, does not result in harm. There has been no showing of harm from its disclosure. We also see that the agency has made a determination that it does not constitute, it does not violate, it is not covered by the restrictions on SSI or proprietary information. And that, again, that is not contested here. They don't say that under federal law, the advance notification restricts access to certain persons under federal law. They say that's irrelevant, whether this information is SSI. So with that in context, there aren't a lot of tools that the agency has to protect information that is not protected by federal law. Right? Federal law does not restrict who can get that information. But aren't you supposed to under six? That's the whole point. You're supposed to establish security and confidentiality protections for these three types of very extensive and very dangerous types of information. How many stops they make, how many times each week, where they go, the route, that you have to establish security and confidentiality protections. I don't think your opponents are saying there are any federal standards. That's their whole point. There aren't any. And this is supposed to make you adopt them. Your Honor, there are a lot of different parts of your question, that your question raises a lot of different things, one of which is the advance notification does not actually include many of the things you listed. It does not include all the stops. It does not include dwell times and stations. It does not include origin or destination points. All it is, all it tells you, how many times a week does the train come through? Three times. Does it say it comes through Monday, Wednesday, and Sunday? No. Does it say what time they come through? No. It is the most aggregated and general of information. It is relevant and significant only for planning purposes. The agency has made that determination, and it isn't contested here. Am I reading 3A, B, C, D, E, F, which is part of this advance notification and information, am I reading all of these things that have to be disclosed as not having to be disclosed? I mean, the reasonable estimate of the number of trains expected to travel per week through each county, updates as to the volume or frequency of trains traveling through a county, the identification of Class III flammable liquid. Yes, Your Honor. But this is not very specific information, and as I said, the agency has determined. Well, we have a different view of what specific information is. I could draw a contrast with what is required in the train consist information. That is very specific, and it would be of great interest to people who should not be getting it. But this is very general and aggregated information, and it has been disclosed for six years, and there has been no shot of harm. Now, to the extent that Your Honor was, I believe Your Honor was asking about what protections did. Slow down a second. Would it be easy to establish the harm? If the concern is information in the hands of competitors, and by definition the railroads don't have information as to the thought processes of the competitors, could it be established one way or the other that there was harm or wasn't harm? Well, Your Honor, they haven't even tried. I understand that. But you're saying that we know from the fact that we don't know anything that the information caused to be disclosed had no effect. How would we ascertain effect? How would we ascertain effect? If you would like me to speculate, I would say, for instance, they're saying that the competitors are watching and can easily piece together one county to another. Well, if after this information was disclosed, and it's been disclosed month after month with updates for six years, if they began to lose customers to other modes of transportation, which is their argument, then they could come in and they could say, we have anecdotal evidence of this. But no one has ever shown, made any showing. So there is no indication of harm. And what that underscores is how unnatural a reading of the statute it is to presume that, therefore, Congress intended to put into place a complete prohibition on any of this information being disclosed to anyone who isn't specifically numerated in A. It might have wanted the agency to exercise judgment as to what deserved protection. And that is exactly what happened here. Well, what the agency said was, well, it's not protected by State law. Well, it's not protected by preexisting Federal law. In fact, Your Honor, the agency did not say it's not protected by State law because that is a question for each State. Each State has different laws. And, in fact, some are quite stringent about what they allow to go, to be disseminated from the State Emergency Response Commissions. That's, in fact, why you have A-4. Because A-4 requires the Emergency Response Commissions to provide that to law enforcement and to other political entities upon request because that wasn't happening. So some are quite stringent and others are less stringent in what they allow to be disclosed upon request. So, but what this statute does not do is say that even if the agency has made a determination that under Federal law there are no unauthorized persons, you nonetheless have to shield this information and prevent it from going out to others regardless of whether disclosure will cause harm, regardless of how significant the information is, regardless of whether other Federal law protects it. Nonetheless, you have to find somebody who does not get this information. And that is not a natural reading of this statute. We are not going to lightly assume that Congress meant to compel the agency to shield information regardless of whether it needs to be protected. And there are determinations here by the agency that this information, as it currently stands, is not information that is protected from disclosure under Federal law. The agency has said it might be under State law. And that's what the regulation does. I mean, the whole, all of A is about formalizing the process, right, extending the disclosure requirements. And so in A6 they're saying put into place regulations. And so the agency has adopted a regulation that involves essentially labeling. And labeling is an important protection for information. You label something as classified or label it as top secret, and it tells people who gets to see it and who doesn't get to see it. So this says, and this says to the railroads, you should notify the states when you give the information, you can tell them that you believe this is protected under State law. And then it will help protect the information because before they, when they get a request to disclose it, at that point they will be on notice that you have raised this. Does it mean they will do exactly what you say and share your opinion of State law? Well, maybe they will and maybe they won't. That's a different question. This isn't about giving anybody a veto power. This is about alert the state. Let them know that you have a concern and you believe this is protected by State law. Could they, were they doing this before? Well, some of the railroads were. But all of this is about formalizing the process. So now there is a regulation. And that is a protection. I don't want to belabor the points that are in our brief. Is there an argument in the rulemaking that putting on too many protections here would make it difficult for the response centers to deal with the information in the way that they needed to? The response centers need to be able to share the information. That is, the response centers exist because of the Emergency Preparedness and Community Right to Know Act of 1986. This is all about preparing within the community in the event of accidents. Rail accidents were, in fact, the background for this. So they do have to be able to share it. They don't just keep the information, or they're not supposed to. They are supposed to share it with local emergency planning committees and first responders. And what the kind of historic backdrop tells us is that there had been a number of derailments in which information was not sufficiently shared with first responders. So that was the impetus for the emergency plan. And that is kind of carried over into the FAST Act. They say share even more widely. And we're going to have some provisions that require you to share upon request. So it is particularly odd to have the petitioner's reading of the statute in that context of a statute that is about disclosure to the state and making sure it gets down to the responders on the ground. To say that, nonetheless, you should not disclose any of this information beyond the people who are enumerated. Well, every state, when I say that the conditions on the ground are going to dictate different levels of disclosure in the different states, that's because every state is different. If you're a rural state, you're going to maybe in small towns, you're dependent upon first responders who are volunteer firefighters. And in that situation, maybe half the town is volunteer firefighters. So that's going to be a widespread disclosure. And in a more densely populated state, it will be different. And I see that my time is up. If there are any further questions for the court, we would ask the court to deny the petition. Thank you. Thank you, Your Honor. I'd like to pick up where my friend left off. The question here is not whether first responders should have access to this information. We fully agree with the government that that was both the intent of the emergency order and Congress's intent in the FAST Act. And that is spelled out in the FAST Act itself. In paragraph A-4, the emergency response commissions must provide the information to any political subdivision of a state or any public agency responsible for emergency response or law enforcement. Your Honor, that easily includes a small town where half the town are volunteer firefighters. And we have no quarrel with that information being disclosed there. The question here is whether this information should be disclosed to the general public. And the agency, although it takes the opposite position now, has consistently recognized that that was not the intent of this program. Shortly after it issued the emergency order that Congress has now codified in the FAST Act, the agency issued a guidance document, which is discussed in the NPRM here at JA35. And it said this. This data is intended for those persons with a need to know, that is, first responders at the state and local level, as well as other appropriate emergency response planners. DOT expects the emergency response commissions to treat this data as confidential, providing it only to those where they need to know and with the understanding that recipients of the data will continue to treat it as confidential. Your Honor, that is all we are asking for here. Finally, to touch a point that you asked about, Judge Williams, the agency has not, in fact, exercised its discretion under this statutory language to decide that this information should or should not be disclosed to the public, apart from whether it is protected as SSI under existing regulations. Throughout the rulemaking materials, the agency has consistently taken the position that its hands are tied because this information is not SSI under existing rules. So even if you think that this statutory language gives the agency some discretion to decide whether this information should be protected, you cannot uphold this rule on that basis because the agency has not, in fact, exercised its judgment to do so. Looking ahead hypothetically to a proceeding in which the agency tries to exercise its discretion, is it the case, as counsel to the agency suggested,  that nothing happened to suggest that there was any disclosure which in any way competitively presumably harmed the railroads? I'm not sure that's quite right, Your Honor. So first, as you pointed out, of course, it would be extraordinarily difficult for us to know whether a competitor had pieced together this information. But you are the just Union Pacific. So you ought to know whether you've gotten any benefit from finding out your competitor's information. Yes, Your Honor. I am not aware of any benefit that UP has derived from its competitor's information in that regard. The other point I will make on this topic, Your Honor, is that although my friend referred a few times to the six-year passage where these rules have been in place, I don't take the agency to have evaluated this question throughout that time or at the end of that time. It determined in the Paperwork Reduction Act notice in 2014, which is in the JA at page 18, that the railroads had not then shown any specific instances of harm, not future harm or potential harm, but actual harm that had already occurred. The agency said, well, you haven't shown that. And then every other time throughout the rulemaking process, it just pointed back at that determination and said, well, you haven't shown any harm. And they started referring to it as a failure to show prospective harm, but that's never what it was, and that's not what the agency said in the first place. So I don't think the agency actually has made that determination in any event. Unless there are any further questions, we ask you to vacate and remand. Thank you. Thank you, Madam Undersecretary.
judges: Garland, Henderson, Williams